FILED
2007 Dec-28  PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| TRAVIS ALLAN CRYER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. 05-S-696-NE |
| | ) | |
| WERNER ENTERPRISES, INC., | ) | |
| and LARRY RANDALL KIRBY, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the court on plaintiff's motion *in limine*,[1] as well as defendants' motion to strike certain evidence submitted by plaintiff in support of that motion *in limine*.[2]  The case arises out of a motor vehicle collision that occurred during the evening "rush hour" in the City of Madison, Alabama, on March 2, 2004. The court already has described, in some detail, the facts of that incident in a previous opinion;[3] accordingly, only the essential details will be repeated here.

## I.  FACTUAL SUMMARY

The collision occurred on Madison Boulevard, a four-lane highway with two eastbound lanes, two westbound lanes, and a grassy median in the center of the

---

[1] Doc. no. 52 (Plaintiff's Motion *in Limine*).

[2] Doc. no. 56 (Defendants' Motion to Strike).

[3] *See* doc. no. 66 (Memorandum Opinion Addressing Defendants' Motion for Partial Summary Judgment).

roadway.[4]  Defendant Larry Randall Kirby, a commercial truck driver working for defendant Werner Enterprises, Inc., was operating a 2003 Freightliner Century 18-wheel, tractor-trailer rig westbound on that roadway when he realized that he had missed his intended turn.[5]  Kirby responded by pulling the rig over to the north side of the westbound lanes, so that the truck and trailer came to rest on the right shoulder of the roadway.[6]  From that position, Kirby waited for a gap in the traffic and an opportunity to re-enter the roadway.[7]  His plan was to execute one continuous turn from the north shoulder of Madison Boulevard, across both westbound lanes, through a paved passage in the center median, and into the inner-most lane of the eastbound lanes.[8]  In other words, although Kirby refused to characterize the maneuver as such, he intended to perform what is commonly known as a "U-turn" across three lanes of heavy, drive-time traffic.[9]

Meanwhile, in a parking lot east of Kirby's location, plaintiff Travis Allan

---

[4] *Id*. at 3 (and accompanying citations).

[5] *Id*. (and accompanying citations).

[6] *Id*. at 4 (and accompanying citations).

[7] *Id*. at 5 (and accompanying citations).

[8] *Id*. (and accompanying citations).

[9] *Id*. (and accompanying citations).  *See also* Deposition of Dr. Joey K. Parker ("Parker Depo."), at 121, line 19 - 122, line 3 (opining that "[a] classic U-turn is a 180-degree motion of a vehicle.  It was headed west and now it's headed east, for example.  My reconstruction of the accident shows that the Werner vehicle turned through approximately 160 degrees, so while not a complete U-turn, it could be characterized as a modified U-turn.").

Cryer was waiting in his pick-up truck for a break in the flow of traffic, so he could enter the westbound lanes of Madison Boulevard and proceed toward Kirby's tractor-trailer rig.[10]  Eventually, there came a point when the closest westbound vehicle was approximately 200 feet away from the parking lot where Cryer was waiting,[11] and he seized the opportunity to pull-out onto Madison Boulevard, picking the inner lane on the westbound side of the road — *i.e.*, the lane farthest away from the tractor-trailer rig's position on the north shoulder several hundred feet ahead.[12]  Kirby also recognized the same gap in the traffic, but he did not notice that Cryer already had seized the opportunity to enter Madison Boulevard.[13]  Accordingly, Kirby began his planned turn.  It was not until the cab of Kirby's truck reached the median, and he looked back to his left, that he saw Cryer's vehicle for the first time.[14]

Cryer testified that he had seen Kirby's 18-wheel rig on the shoulder as he was waiting to exit the parking lot, but the next time he made eye-contact with the rig was when it pulled in front of him.[15]  Cryer stated that, at the moment of visualization,

---

[10] Doc. no. 66, at 5-6 (and accompanying citations).  Cryer testified that his truck was manufactured by Chevrolet in 1997, and that it was a "Z-71" model, but other testimony strangely suggests that it was a GC "Sierra."

[11] *Id*. at 6 (and accompanying citations).

[12] *Id*. (and accompanying citations).

[13] *Id*. (and accompanying citations).

[14] *Id*. (and accompanying citations).

[15] *Id*. at 6-7 (and accompanying citations).

3

Kirby's rig was not yet into the median, but it was blocking both lanes of westbound traffic.[16]  Cryer claimed that, by that point, he was traveling at approximately 40 to 45 miles-per-hour (the speed limit along that stretch was 55) and, even though he applied his brakes in earnest, he could not avoid the collision.[17]  Kirby apparently attempted to accelerate in an attempt to avoid contact as well, but to no avail:  Cryer's pick-up collided with, and slid under, the trailer hitched to Kirby's tractor.[18]

Defendants hired an expert, Dr. Joey K. Parker, to reconstruct the scene of the collision and to create video simulations of what might have happened if Cryer had noticed Kirby's presence in the roadway at an earlier point in time.[19]  Dr. Parker is a professor of mechanical engineering at the University of Alabama, but he also performs independent contracting work for the engineering firm of "Doughty and Powers."[20]  He used a computer program called "EDSMAC-4" in an attempt to demonstrate that Cryer could have avoided the collision by applying his brakes at an earlier time.[21]  Cryer now challenges the admissibility of Dr. Parker's written report,

---

[16] *Id*. at 7 (and accompanying citations).

[17] *Id*. (and accompanying citations).

[18] *Id*. (and accompanying citations).

[19] Parker Depo., at 220, lines 4-14.

[20] *Id*. at 7, line 18 - 8, line 21.

[21] Dr. Parker testified that "EDSMAC-4" is an abbreviation for "Engineering Dynamics Simulation of Motor Vehicle Accident Collisions [Version 4]."  *Id*. at 157, line 16 - 158, line7.  The EDSMAC-4 program uses accepted physics-based calculations to simulate the movement of vehicles.  *See* Final Expert Report Dated December 15, 2005 ("Final Expert Report"), at 5.

oral testimony, and his video simulation and reconstruction of the crash on multiple grounds.

## II.  DR. PARKER'S ANALYSIS

In putting together his expert report and accident reconstruction / simulation videos, Dr. Parker relied upon:  an inspection of the vehicles and accident scene; photographs of the vehicles and accident scene; the Alabama Uniform Traffic Accident Report filed by the police officers who responded to the scene; the depositions of those officers and other eyewitnesses; and several scientific papers or manuals concerning accident reconstruction and/or the vehicles involved.[22]  Based on all of this, and with the assistance of the EDSMAC-4 software and its embedded mathematical formulas, Dr. Parker reconstructed the collision and estimated the speeds and braking of the two vehicles involved.  As mentioned above, he also created video simulations of what might have occurred if Cryer had applied his brakes at an earlier point in time — hypothesizing that Cryer could have stopped his pick-up truck somewhere between 20 and 124 feet away from Kirby's tractor-trailer.[23]  Cryer attacks both the reconstruction itself and these "what if" simulations by criticizing the ingredients that went into Dr. Parker's problem-solving recipe.  To understand and

---

[22] *See* Final Expert Report, at 2.

[23] *Id*. at 7.

evaluate Cryer's criticisms, it is necessary to retrace Dr. Parker's analytical steps.

Dr. Parker's first challenge was to establish the actual path that the tractor-trailer rig followed as it crossed Madison Boulevard prior to impact.  Since no one can state with certitude precisely where the rig was parked before entering the roadway, Dr. Parker began by extrapolating backward, starting from the spot at which Kirby's tractor-trailer rig came to a rest following the collision.[24]  Police officers had marked that location with paint after arriving at the scene, so Dr. Parker measured the paint marks and entered that information into the EDSMAC-4 software program.[25] He then estimated the rig's starting position by placing it in various hypothetical locations on the right-hand (north) shoulder of Madison Boulevard, and attempting to make the rig reach the known endpoint.[26]  The starting point he finally settled upon was consistent with the position Kirby described in his deposition.[27]  On the other hand, the hypothetical path finally selected by Dr. Parker — if it actually had been followed by Kirby — would have resulted in his rig leaving the paved roadway and crossing the grass and dirt in the median, but there is absolutely no physical evidence

---

[24] *See*, *e.g.*, Parker Depo., 64, lines 12-19; *id*. at 184, line 18 - 185, line 2.

[25] *Id*. at 65, lines 13-21; *id*. at 87, lines 2-9; *id*. at 128, lines 8-13.

[26] *Id*. at 64, lines 12-19; *id*. at 65, lines 2-21.

[27] *Id*. at 64, lines 12-19; *id*. at 188, line 22 - 189, line 7.

to confirm that assumed course.[28]

Dr. Parker next needed to gauge how quickly the tractor-trailer rig could accelerate from a dead-stop in its pre-crash location to the ultimate resting position post-collision.[29]  Significantly, Dr. Parker did not have any acceleration data for the truck actually driven by Kirby:  a 2003 Freightliner Century with a 12.7 liter Detroit Diesel engine.  Instead, Dr. Parker substituted data from a *1995 Freightliner FLD-120*, which *supposedly* had a similar engine and horsepower rating.[30]  However, that data — even if similar to the truck actually driven by Kirby — still was slightly off the mark because it was compiled during straight-line, low-speed, acceleration testing, whereas Kirby was accelerating quickly while making a hard left turn in rush hour traffic.[31]  It also is not clear whether a 1995 Freightliner FLD-120 actually is similar in weight to the 2003 Freightliner Century model.[32]  Nevertheless, Dr. Parker

---

[28] *Id*. at 204, lines 5-9; *id*. at 205, lines 18-22.

[29] *Id*. at 107, line 17 - 108, line 12; *id*. at 197, lines 3-23.

[30] *Id*. at 102, lines 2-17; *id*. at 108, lines 3-12; *id*. at 198, line 23 - 199, line 2.  Dr. Parker culled this data from a paper written in 1999 by Wesley D. Grimes and Charles P. Dickerson, entitled "Low Speed Acceleration of the Freightliner FLD-120 Tractor-trailer."  *See* doc. no. 55 (Defendants' Brief in Response to Plaintiff's Motion *in Limine*), Ex. 4 (Acceleration Study).

[31] Parker Depo., at 108, lines 9-23.  This discrepancy should theoretically enure to Cryer's benefit, however, because Dr. Parker testified that an actual tractor-trailer cannot accelerate as rapidly in a hard left turn as it can in a straight line, *id.*, and the faster the tractor-trailer darted into the path of Cryer's vehicle, the less time Cryer would have to perceive its presence and apply his brakes.  In other words, Cryer's inability to stop in time to avoid colliding with Kirby's tractor-trailer could be attributed to factors beyond his control, rather than to his own negligence in failing to quickly perceive an obstacle in the roadway or to apply his brakes in response to it.

[32] *Id*. at 110, lines 6-15.

7

testified — albeit not convincingly — that the actual weight of the two Freightliner vehicles was not a significant factor in his computations.[33]  Accordingly, Dr. Parker programed the data for the 1995 model Freightliner into his computer and created an "acceleration profile" for Kirby's 2003 model that indicated the speed of that tractor-trailer rig would be somewhere on the order of 9.9 to 11.7 miles-per-hour at the time it was engaged in the "U-turn" maneuver.[34]

Another important consideration to take into account was the speed of Cryer's pick-up truck, both before braking and at the moment of impact.  Dr. Parker estimated the speed at impact by examining physical damage to Cryer's vehicle, in accordance with the only published approach of which he was aware.[35]  Specifically, he viewed *photographs* of the wrecked truck and incorporated his observations into an established formula, arriving at a probable speed at impact of 25 to 31 miles-per-hour.[36]

Dr. Parker then combined this information with data gleaned from viewing the tire (skid) marks left by Cryer's pick-up truck, to estimate the speed of that vehicle

---

[33] *Id*. at 109, line 13 - 110, line 3.

[34] Dr. Parker apparently adjusted the "acceleration profile" until he achieved the fastest of the four runs from the published test data.  *Id*. at 108, lines 3-12; *id*. at 197, lines 3-9.  Again, this adjustment should theoretically work in Cryer's favor.  *See supra* n.31.

[35] Parker Depo., at 140, lines 6-16.

[36] *See*, *e.g.*, *id*. at 160, lines 7-10.

*prior* to braking.[37]   Relying on photographs and measurements made by police officers who responded to the scene of the collision, Dr. Parker concluded that the tire marks extended roughly 45 feet.[38]   At this point, Dr. Parker knew the speed at impact and the distance between initial braking and impact.   To ascertain the pre-braking speed, he needed to determine what effect 45 feet of braking would have had on the vehicle's speed.   The key to making this determination was selecting the appropriate "drag deceleration factor," or "coefficient of friction," for Cryer's truck, and plugging that variable into a common formula for estimating speeds.[39]   Pinpointing one constant coefficient of friction is something of a guessing game, however, because the variable steadily increases during the braking process.[40]   In general, the coefficient of friction is dependent upon, among other factors, the roadway surface and the condition of the treads on the tires of the subject vehicle.[41]   Significantly, Dr. Parker

---

[37] *Id*. at 160, line 4 - 161, line 15.

[38] *Id*. at 81, lines 1-16; *id.* at 137, lines 6-9; *id.* at 160, lines 10-12.  Dr. Parker determined that the Cryer vehicle was being braked *and* steered as it produced these tire marks.  *Id*. at 73, lines 10-13.

[39] *See*, *e.g.*, *id*. at 77, lines 10-23.  "Coefficient of friction" is defined as "the ratio of tangential force that is needed to start or to maintain uniform relative motion between two contacting surfaces to the perpendicular force holding them in contact."  *Webster's Unabridged New International Dictionary* 438 (3d ed. 2002).

[40] As a rule, the lower the coefficient of friction, the longer it will take a moving object to stop.  *See* Parker Depo., at 70, line 20 - 71, line 3.  Predictably, then, "[c]oefficients of friction  or drag factors are higher at lower speeds than they are at higher speeds."  *Id*. at 163, lines 11-13.  *See also id*. at 166, lines 4-6 (noting that "the coefficient of friction is actually changing slightly during the whole braking process").

[41] *See* Parker Depo., at 96, 16-23; *id*. at 161, line 22 - 162, line 1; *id*. at 174, lines 1-17.

neither examined the road surface nor inspected the tires on Cryer's pick-up.[42]

Instead, he originally assumed a coefficient of friction of 0.75 g, which is typical for

*passenger cars* traveling below 33 miles-per-hour on asphalt that is well-worn.[43]

Later, he utilized a constant coefficient of friction of 0.6 g, because that was the

default value for the relevant speed and load range on the EDSMAC-4 program.[44]

According to Dr. Parker, "[t]he exact value makes very little difference in the [overall

speed] calculations"[45] — *i.e.*, just "one to two miles per hour."[46]  In the end, Dr.

Parker arrived at a pre-braking, or "effective braking," speed estimate of 40 to 44

miles-per-hour.[47]  This is in line with Cryer's own characterization of his speed at the

---

[42] *E.g.*, *id.* at 96, lines 2-7.

[43] *Id.* at 69, lines 16-19; *id.* at 161, line 22 - 162, line 1; *id.* at 162, lines 16-22.

[44] *Id.* at 78, lines 18-22; *id.* at 163, lines 4-22; *id.* at 221, lines 7-10; Final Expert Report, at 6.  Notably, Dr. Parker testified that a coefficient of friction of 0.75 g would enable Cryer to stop his pick-up *more quickly* than would a coefficient of 0.6 g.  Parker Depo., at 234, line 19 - 235, line 2. He also acknowledged that "Mr. Cryer was [probably] at or very close to the maximum braking level capabilities of his vehicle and [that] there would have been a load shift."  *Id.* at 218, line 22 - 219, line 2.

[45] Parker Depo., at 166, lines 6-8.

[46] *Id.* at lines 9-10.

[47] *E.g.*, *id.* at 161, lines 5-15.  As a part of the simulation and reconstruction process, Dr. Parker also endeavored to ascertain the rate of the Cryer truck's acceleration *up to* the point of braking.  *See id.* at 192, lines 5-12.  Testimony indicates that the pick-up accelerated from a resting position in a parking lot adjacent to Madison Boulevard, across the first lane of eastbound traffic, and turned into the second eastbound lane, reaching a speed of approximately 40 to 44 miles-per-hour.  *See* doc. no. 66, at 6 (and accompanying citations).  To make the pick-up reach that speed in the simulation, Dr. Parker applied acceleration rates of .18 g and .28 g.  *See, e.g.*, Parker Depo., at 190, line 23 - 191, line 10.   He settled on these rates after reviewing the acceleration data for the *two-wheel-drive* version of Cryer's *four-wheel-drive* pick-up, because that is the only data he had on hand.  *Id.* at 191, lines 11-20.  Dr. Parker testified that the data for the two-wheel-drive version

moment of braking.[48]

Perhaps the most important determination made by Dr. Parker, at least for purposes of creating "what if" simulations, was an approximation of the moment at which Cryer should have detected the presence of Kirby's tractor-trailer rig in the roadway and acted to avoid a collision.[49] After all, if Cryer could be expected to have noticed, and reacted to, Kirby's presence earlier than he actually did, a jury might reasonably conclude that Cryer was himself negligent.   By his own admission, however, Dr. Parker is "not an expert on perception / reaction time."[50]  Therefore, in analyzing this crash, he "simply use[d] the standard that [allegedly] is commonly used in accident reconstruction."[51]  Dr. Parker testified that he has a book that he employs

_____

"gave a maximum zero to 60 acceleration g force or acceleration rate of [.28] g's."  *Id*. at lines 17-20. Dr. Parker found that applying .28 g during the initial turn onto Madison Boulevard resulted in the pick-up spinning out of control, though, so he adjusted it downward to .18 g to achieve a smooth entry onto the roadway, and only once the turn was completed did he increase the acceleration rate to the maximum of .28 g.  *See id*. at 191, line 22 - 192, line 12.  Cryer criticizes the use of this data, because, as Dr. Parker admitted, the four-wheel-drive version of the pick-up weighs 501 pounds more than the two-wheel-drive, and also has about 50 more horsepower.  *Id*. at 193, lines 16-21; *id*. at 194, lines 8-10.  Both of these variables can affect acceleration, *id*. at 194, lines 15-17, but Dr. Parker insisted that his proffered acceleration profile is "a very good approximation."  *Id*. at 193, lines 4-5.

[48] *See* doc. no. 66, at 7 (and accompanying citations).

[49] *See*, *e.g.*, Parker Depo., at 207, line 5 - 208, line 1; *id*. at 236, lines 2-7.

[50] *Id*. at 213, lines 17-18.  Dr. Parker did explain that "[p]erception is the part of the process where you receive . . . a visual stimulus and your mind recognizes that there's a situation and make[] a decision," *id*. at 206, lines 14-18, whereas "the reaction component would involve actually taking your feet off the accelerator and putting [them] on the brake and applying the brake."  *Id*. at 206, line 21 - 207, line 1.

[51] *Id*. at 213, lines 18-20.

as a standard reference, and that book's author "say[s] if you have an *uncluttered environment* with a *relatively simple* decision tree, then 1.5 seconds is a commonly used [perception / reaction] value."[52]   A "cluttered environment," according to Dr. Parker, "would be, for example, entering an intersection with vehicles coming at you from multiple directions."[53]   Here, Cryer was allegedly maneuvering his pick-up in heavy, relatively fast-moving, rush-hour traffic, while accelerating to ensure that he kept ahead of oncoming vehicles approaching from his rear, when Kirby suddenly pulled out in front of him.[54]   Nevertheless, Dr. Parker concluded, based on his reference book, that Cryer was operating in "a non-cluttered situation."[55]   Hence, he assumed a perception / reaction time of 1.5 seconds.[56]   Based upon this assumed value, and all of the other assumptions previously discussed, Dr. Parker opined that Cryer could have stopped his truck as much as 124 feet away from defendants' tractor-trailer rig; and, at the very least, Cryer should have been able to stop 20 feet

---

[52] *Id*. at 178, lines 12-19 (emphasis supplied).  The book is Paul L. Olsen, *Forensic Aspects of Driver Perception and Response* (1996).  Parker Depo., at 179, lines 22-23.  *See also* doc. no. 55, Ex. 5 (Olsen Excerpt).

[53] Parker Depo., at 178, line 22 - 179, line 2.

[54] *See id*. at 179, lines 7-18.

[55] *Id*. at 179, lines 19-20.

[56] *Id*. at 178, lines 6-10.  Dr. Parker testified that, of that 1.5 seconds, "[r]eaction time is usually considered to be somewhere on the order of half a second."  *Id*. at 206, lines 2-4.

prior to making contact.[57]  Specifically, Dr. Parker felt that it would have been

possible for Cryer to stop his pick-up between 100 and 124 feet prior to impact *if* the

1.5 second perception / reaction time had commenced when the front corner of

defendants' tractor-trailer rig crossed the center stripes of the westbound lanes of

Madison Boulevard.[58] Alternatively, even if the 1.5 second perception / reaction time

did not begin until the front corner of Kirby's tractor-trailer completely crossed the

inner westbound lane that Cryer was traveling in, Dr. Parker was of the opinion that

Cryer still should have been able to bring his pick-up truck to a stop somewhere

between 20 to 26 feet short of the tractor-trailer rig.[59]

Cryer argues that all of "[Dr. Parker's] opinions and simulations are based upon

insufficient, incomplete and unreliable data that does not meet the standards of

Federal Rule of Evidence 702, *Daubert* [*v. Merrell Dow Pharmaceuticals*, *Inc.*, 509

U.S. 579 (1993)] and *Kumho Tire* [*Co. v. Carmichael*, 526 U.S. 137 (1999)]."[60]

### III.  DISCUSSION OF LAW

The starting point for any discussion of the admissibility of opinion testimony

---

[57] Final Expert Report, at 7.  *See also*, *e.g.*, Parker Depo., at 223, lines 11-17 ("I based my simulations on my reconstruction and then two scenarios, one where the Werner vehicle was just crossing the centerline and one where the Werner vehicle was just crossing the dashed yellow lines marking the left-hand side of the westbound lane.").

[58] Final Expert Report, at 7.

[59] *Id*.

[60] Doc. no. 53, at 21.

offered by so-called "expert witnesses" is Federal Rule of Evidence 702. *See*, *e.g.*, *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (*en banc*). As amended in 2000, in response to the Supreme Court's decisions in *Daubert* and *Kumho Tire*,[61] that Rule now provides that:

> If scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness *qualified as an expert* by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon *sufficient facts or data*, (2) the testimony is the product of *reliable principles and methods*, and (3) the witness has *applied* the principles and methods *reliably to the facts* of the case.

Fed. R. Evid. 702 (emphasis supplied). The requirements of this Rule can be grouped under three broad headings: qualifications, reliability, and helpfulness. *See*, *e.g.*, *Frazier*, 387 F.3d at 1260; *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003) (discussing the "three part inquiry [used] to determine the admissibility of expert testimony under Fed. R. Evid. 702").

Fidelity to the "gatekeeping role" superimposed upon the trial court by the

---

[61] "In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based on science." Advisory Committee Note to Fed. R. Evid. 702 (2000 Amends.). In both of these cases, the Court endorsed a "flexible" five-factor test that complements Rule 702's reliability inquiry and is intended to help district courts perform the gatekeeping duty. *Daubert*, 509 U.S. at 593-94; *Kumho Tire*, 526 U.S. at 149-50. This test will be discussed with much more particularity below.

*Daubert* decision[62] requires district court judges to

> engage in a rigorous inquiry to determine whether:  "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Rink v. Cheminova*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (quoting *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted)).  *See also Frazier*, 387 F.3d at 1260 ("While there is inevitably some overlap among the basic requirements . . . they remain distinct concepts and the courts

---

[62] Wrenching changes in federal evidentiary principles occurred as a result of the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which held that the "general acceptance" test framed in *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (D.C. Cir. 1923), "should not be applied in federal trials" because it had been superseded by the Federal Rules of Evidence enacted by Congress in 1975.  *Daubert*, 509 U.S. at 588-89 & n.6.  *See also General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997) (observing that *Daubert* held "that the 'austere' *Frye* standard of 'general acceptance' had not been carried over into the Federal Rules of Evidence").

In place of the general acceptance standard, *Daubert* substituted *the trial court judge*, acting in the role of "gatekeeper" to the jury box, *see* 509 U.S. at 589 n.7, 597, and charged the judge with the "obligation" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Id*. at 589.  *See also id*. at 594 (observing that Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"), and 597 (same).

In procedural terms, this means that the trial judge is required to conduct "a preliminary assessment" pursuant to Federal Rule of Evidence 104(a) as to "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id*. at 593-94.

must take care not to conflate them.").[63]  The burden of satisfying the district court

that these three elements are present in a given case falls upon the party proffering the

expert witness.  *See*, *e.g.*, *Rink*, 400 F.3d at 1292 ("The party offering the expert has

the burden of satisfying these three elements by a preponderance of the evidence.")

(citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999));

*McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (same); *Frazier*, 387 F.3d

at 1260 (same).

Defendants have attempted to characterize the instant motion as one that

attacks the *reliability* of Dr. Parker's testimony and, specifically, the sufficiency of

the *facts or data* upon which he bases his conclusions.[64]  This court does not share

that limited understanding of the motion.  Although Cryer clearly does contend that

the Dr. Parker's testimony is lacking a firm factual foundation, he also devotes

---

[63] It is important to understand that this categorization really is nothing more than a rearrangement and consolidation of the explicit requirements of Rule 702.  The first and third prongs of the Eleventh Circuit's test (qualification and helpfulness, respectively) are taken from Rule 702's preamble.  *See* Fed. R. Evid. 702 ("If scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to determine a fact in issue, a witness *qualified as an expert* by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . .") (emphasis supplied).  The major change accomplished by the Eleventh Circuit's restatement is truncation of Rule 702's three-part litmus test for methodological reliability.  *See* Fed. R. Evid. 702(1)-(3).  Clearly, that does not mean that district courts are to *ignore* the explicit language of Rule 702; on the contrary, the Eleventh Circuit's formula simply recognizes that the three numbered prerequisites (and the additional thoughts imparted by the Supreme Court in *Daubert*) all relate to the same general concern:  the reliability of the methodology utilized by the expert.  Procedurally, then, the district court should consider satisfaction of those requirements separate and apart from qualification and helpfulness.

[64] *See* doc. no. 55, at 4.

significant discussion to the issue of Dr. Parker's qualifications and, more broadly, he questions the relevance of Dr. Parker's testimony. As it turns out, the court agrees with Cryer on all counts.

## A.    Dr. Parker's Qualifications

Dr. Parker holds a Ph.D. in engineering, serves as a professor of mechanical engineering at the University of Alabama in Tuscaloosa, and is a licensed Professional Engineer.[65] He has completed several courses on accident reconstruction techniques, and even taught accident reconstruction principles in courses at the University of Alabama.[66]   Consequently, no one disputes his credentials as an accident reconstructionist.[67]   On the other hand, plaintiff's attorneys vehemently dispute the sufficiency of Dr. Parker's "qualifications to render any opinion regarding perception-reaction times or the specific perception-reaction time of . . . Travis Cryer."[68]   *See generally Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392 (D. Md. 2001) ("[A]n expert who is a mechanical engineer is not necessarily qualified as an expert on any issue within the vast field of mechanical engineering."). This is a significant challenge, because holding Dr. Parker unqualified to make any

---

[65] Parker Depo., at 6, line 15 - 7, line 20; *id.* at 18, lines 3-11.

[66] *Id*. at 18, line 20 - 22, line 6.

[67] *See* doc. no. 57 (Plaintiff's Reply in Support of Motion *in Limine*), at 6.

[68] *Id*.

assumption as to Cryer's perception / reaction time would, *ipso facto*, preclude any utilization of Dr. Parker's perception / reaction time-dependent video simulations.[69]

It is settled that experts cannot be permitted to testify to matters falling outside their general area of expertise. *See*, *e.g.*, *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (finding law professor unqualified to render opinion testimony as to handwriting analysis, notwithstanding the fact that he had informally studied the field and written an article on the subject matter, because "[h]is skill, experience, training and education as a lawyer did not make him any more qualified to testify as an expert on handwriting analysis than a lay person who read the same articles"); *Montgomery v. Nova*, 168 F.3d 1282, 1303 (11th Cir. 1999) (upholding the district court's exclusion of an expert's testimony where the district court found that the field of the expert's expertise and the field on which his testimony was based were "totally distinguishable"); *Weisgram v. Marley Co.*, 169 F.3d 514, 518 (8th Cir. 1999) ("Although Freeman clearly was qualified as a fire cause and origin expert, there is no question that he was not qualified to offer an opinion that the Weisgram heater malfunctioned and he should not have been permitted to do so.").

The parties have not directed the court to any cases discussing the question of

---

[69] Dr. Parker agreed that the perception / reaction time value is "very important" to his simulations of what might have happened had Cryer reacted to the presence of the tractor-trailer at an earlier point in time. *See* Parker Depo., at 207, line 22 - 208, line 1.

when an accident reconstruction expert or mechanical engineer might be considered qualified to state admissible opinions concerning human perception / reaction times. The only case this court has located that touches upon that subject is an unpublished decision of the United States District Court for the Eastern District of New York. *See Castaldi v. Land Rover North America*, *Inc*., No. 06-CV-1008-JG, 2007 WL 4165283, at * 7 (E.D.N.Y. Nov. 21, 2007). There, the court was charged with determining whether an engineer who held "himself out as an expert in the subspecialty of human factors concerning driver actions" could testify as to a driver's perception / reaction time. *Id*. at * 7. The court initially expressed serious doubts as to the engineer's qualifications in that regard, noting that "he . . . never received any formal training in the field of human factors and admit[ted] he [was] not an expert on human factors generally." *Id*. Ultimately, the court decided to exclude the proffered testimony, but "not . . . on this ground alone." *Id*. An additional, and perhaps equally weighty, consideration was the unreliability of the expert witness's chosen perception / reaction time, which he extracted from "an article that actually supported a considerably lower perception-reaction time." *Id*.

This case presents an even clearer justification for a finding of disqualification than *Castaldi*. While the engineer-witness in *Castaldi* confessed that he was "not an expert on human factors generally," *id*., Dr. Parker went farther, stating forthrightly

19

that he is "not an expert on perception / reaction time."[70]  Defendants attempt to minimize the significance of this admission by characterizing it as an off-hand remark made in response to a question concerning the effect of fatigue on perception / reaction time, but the court simply cannot understand how this is an ameliorative consideration.  Indeed, it is *especially* important in a case like this — where there is evidence that the plaintiff-driver was entering heavy, rush-hour traffic after a long day of work — for the witness who intends to opine on that specific driver's perception / reaction time to have some grasp of the factors that might be relevant to selecting an appropriate value.  Dr. Parker repeatedly testified that the propriety of the perception / reaction time he selected (*i.e.*, 1.5 seconds) depended upon a foundational prerequisite that the environment in which the plaintiff was operating his pick-up truck be "uncluttered . . . with a relatively simple decision tree."[71]  Dr. Parker evidently believed that heavy, rush-hour traffic conditions were not relevant to this foundational prerequisite.[72]  However, in light of Dr. Parker's own admission that he is not an expert on perception / reaction time, and, his inability to state whether additional factors such as fatigue might warrant an adjustment of the time selected, the court cannot fathom how he is qualified to offer relevant, reliable

---

[70] Parker Depo., at 213, lines 17-18.

[71] *Id*. at 178, limes 17-18.

[72] *See id*. at 179, lines 3-20.

testimony on this specific plaintiff's perception / reaction time.[73]

For these reasons, the court holds that Dr. Parker is not sufficiently qualified to offer opinion testimony about human perception / reaction times and, therefore, cannot present opinions based upon that value (*i.e.*, his "what if" simulations) to the jury.[74]

## B.   The Reliability of Dr. Parker's Methodology

Even if this court were to hold that Dr. Parker is adequately qualified to render admissible opinions about Cryer's perception / reaction time, it still would exclude his testimony, report, and video simulations (both the "what if" and pure accident

---

[73] To the extent defendants attempt to qualify Dr. Parker by reference to his testimony that the value he chose is "the standard that is commonly used in accident reconstruction," *id.* at 213, lines 18-20, they fail to do so.  This argument is a reference to Federal Rule of Evidence 703, which allows experts who are qualified under Rule 702 to base their opinions upon inadmissible evidence that is "of a type reasonably relied upon by experts in the particular field."  Fed. R. Evid. 703.  But Rule 703 is premised upon the fundamental assumption that experts who utilize otherwise inadmissible evidence will first competently validate that evidence.  *See generally* Advisory Committee Note to Fed. R. Evid. 703 (1972 Proposed Rules).  *See also*, *e.g.*, *Plourde v. Gladstone*, 190 F. Supp. 2d 708, 720 (D. Vt. 2002).  An expert in another field is not qualified to perform that validation, and therefore cannot hide behind the statement that the evidence is commonly relied upon.  *See Plourde*, 190 F. Supp. 2d at 720 ("In this case, Dr. Simon is not a physician, but a toxicologist.  He offers no proof that diagnoses and opinions offered by medical doctors and veterinarians as to causation are regularly relied upon by trained toxicologists who lack medical or veterinary training.  *More importantly*, Dr. Simon offers no textual support for the proposition that toxicologists are *qualified* to evaluate the medical judgments and opinions made by doctors or veterinarians.") (emphasis supplied).

[74] Because the court finds Dr. Parker unqualified to render opinions concerning driver perception / reaction time, it need not consider the evidence submitted by Cryer in support of his alternative argument that Dr. Parker's chosen perception / reaction time value is substantively incorrect.  *See*, *e.g.*, doc. no. 53, Ex. 6 (NHTSA Study).  Thus, defendants' motion to strike that evidence, doc. no. 56, will be denied as moot.

reconstruction scenarios) for another, equally important reason:  failure to pass the reliability test.  *See*, *e.g.*, *Quiet Technology*, 326 F.3d at 1342 ("[O]ur caselaw plainly establishes that one may be considered [a qualified] expert but still offer unreliable testimony.").

The reliability inquiry mandated by Federal Rule of Evidence 702 has three parts:  the district court must ensure that "(1) the testimony is based upon *sufficient facts or data*, (2) the testimony is the product of *reliable principles and methods*, and (3) the witness has *applied* the principles and methods *reliably to the facts* of the case."  Fed. R. Evid. 702 (emphasis supplied).  Below, the court will address each of these requirements, but not in the order of their appearance in Rule 702.  *Cf. Allstate Insurance Co. v. Hugh Cole Builder*, *Inc.*, 137 F. Supp. 2d 1283, 1287 (M.D. Ala. 2001) ("Because Defendants' arguments concerning the sufficiency of the facts carry over into the application of the facts to the methods inquiry, the court will first examine whether the testimony is the product of reliable principles and methods[.]").

### 1.    Reliable principles and methods

Concerned that jurors across the nation were at risk of being misled by purveyors of so-called "junk science," *General Electric Co. v. Joiner*, 522 U.S. 136, 153 (1997) (Stevens, J., concurring in part and dissenting in part), the Supreme Court in *Daubert* charged district courts with conducting "a preliminary assessment of

22

whether the reasoning or methodology underlying the [proffered expert] testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93. *See also* Fed. R. Evid. 104(a) ("Preliminary questions concerning the qualification of a witness . . . or the admissibility of evidence shall be determined by the court[.]"). The Court acknowledged that "[m]any factors will bear on this inquiry," *Daubert*, 509 U.S. at 593, and emphasized the need to remain "flexible," *id*. at 594, but nevertheless went on to provide five "general observations" to assist district judges in measuring reliability. *Id*. at 593. Specifically, the Court held that district judges may[75] consider: (1) whether the theory or technique in question can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether the theory enjoys widespread acceptance within the relevant scientific community. *Id*. at 593-94. The Court further cautioned that "the focus . . . must be solely on *principles* and *methodology*, not on the *conclusions* that they generate." *Id*. at 595 (emphasis supplied). This portion of the analysis often proves to be the most onerous. A close reading of Cryer's motion, however, reveals

---

[75] In *Kumho Tire*, the Court clarified that "a trial court *should* consider the specific factors identified in *Daubert* [only] where they are reasonable measures of the reliability of expert testimony [at issue in the case]." *Kumho Tire*, 526 U.S. at 152 (emphasis supplied). *See also id*. ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable.") (emphasis in original).

that he does not challenge the methodology that Dr. Parker employed, but rather Dr. Parker's adherence to that methodology and the sufficiency of his data sources. Indeed, no where in Cryer's motion, brief, or reply does he attack the legitimacy of the field of accident reconstruction, or the scientific validity of the computer program that Dr. Parker utilized to create reconstructions or simulations of the collision.

In any case, other federal courts have found the field of accident reconstruction to be generally accepted, and have allowed experts in that field to rely upon similar software programs to reach and express admissible conclusions. *See*, *e.g.*, *Munroe v. U.S. Xpress*, *Inc.*, No. 06-CV-4103, 2007 WL 2476763, at * 1 (D. S.D. Aug. 27, 2007) ("Accident reconstruction is a concept that is generally accepted. . . ."); *Vigil v. Michelin North America*, *Inc.*, No. EP-05-CV-001-KC, 2007 WL 2778233, at * 4 (W.D. Tex. Aug. 23, 2007) (accepting accident reconstruction principles as consistent with *Daubert* and its progeny); *Sport v. Continental Western Insurance Co*., No. 04-1386-KMH, 2006 WL 618271, at * 3 (D. Kan. Mar. 10, 2006) (accepting the validity of a "widely used" accident reconstruction software program). *Cf. Benton v. Ford Motor Co.*, 492 F. Supp. 2d 874, 879 (S.D. Ohio 2007) ("[T]he Court believes that the discipline of accident reconstruction as it pertains to alleged design defects, is sufficiently established and well-accepted in the relevant technical community that it does not raise *Daubert*'s concerns of so-called junk science."). Accordingly, the

24

court proceeds to address the other components of the reliability inquiry.

## 2.       Sufficient facts or data

Even for qualified experts who rely upon accepted, scientifically valid methods, the existence of a sufficient *factual* predicate for the opinion offered "remains a basic foundation for admissibility." *Frazier*, 387 F.3d at 1261. *See also* Fed. R. Evid. 702(1) (indicating that experts may not state an opinion unless that opinion is "based upon sufficient facts or data"); Wright & Gold, 29 *Federal Practice & Procedure: Evidence* § 6266 (2007) ("The question is whether the expert considered *enough* information to make the proffered opinion reliable.") (emphasis in original). "If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *In re Agent Orange Product Liability Litigation*, 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (3d Cir. 1987).

Cryer cites six factual deficiencies that arguably undermine Dr. Parker's analysis. The court need not discuss all of these deficiencies, however, for it finds that just a sampling is sufficient to cast doubt on the entire body of Dr. Parker's work

in this case.[76]

### a.     Acceleration data

First, when attempting to determine how quickly Kirby's tractor-trailer rig could cross the westbound lanes of Madison Boulevard, Dr. Parker used acceleration data for a *different tractor* than the one driven by Kirby.[77]  He did so without knowing whether differentials existed in the weight, transmission, or horsepower of the two trucks.[78]  Similarly, Dr. Parker estimated the acceleration capacity of Cryer's four-wheel-drive pick-up truck by reference to data from the *two-wheel-drive* version of the same vehicle — a vehicle that weighs 501 pounds *less* than Cryer's, and one that

---

[76] The court notes that it rests its decision not merely on the "facts or data" prong of the Rule 702 test, but equally upon the requirements that the methods chosen by the expert be reliably applied to the facts of the case, and that the testimony actually assist the trier of fact.  *See generally* Fed. R. Evid. 702.  As the Eleventh Circuit has observed, these considerations often overlap.  *See Frazier*, 387 F.3d at 1260.  Here, we have a situation in which the expert has reached conclusions by relying upon facts or data that are largely irrelevant, while also failing to consider other information that is more directly relevant.  This can be seen as a sufficiency of the data problem, but it also might be understood as a misapplication of the methodology, which obviously demands accurate inputs in order to produce a reliable result.  *Cf.* Wright & Gold, 29 *Federal Practice & Procedure: Evidence* § 6266 ("Questions concerning the reliability of the facts or data on which an expert opinion is based . . . may pose an issue under Rule 702(3).").  Finally, it might also been viewed as a relevancy problem.  *See*, *e.g.*, *Joiner*, 522 U.S. at 144-45 ("The studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them.").  No matter which paradigm is chosen, the result is the same:  this testimony is not admissible.

[77] Parker Depo., at 105, lines 1-15.

[78] Doc. no. 53, at 11-12.  *See also* Parker Depo., at 105, lines 1-15; *id*. at 108, lines 3-12; *id*. at 110, lines 6-22.

has an engine with a markedly lower horsepower rating.[79]  Dr. Parker admitted that each of these factors could affect the acceleration of the vehicles involved;[80] and, of course, a variation in the acceleration of either of the vehicles could render Dr. Parker's estimate of the point at which Cryer should have perceived and reacted to the tractor-trailer rig's presence in the roadway inaccurate.[81]

Dr. Parker's principal response to this criticism is that he used data from *similar* vehicles. *Cf. Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data.").  He testified, for example, that he used the vehicle identification number of the tractor Kirby was driving to determine that it had a 12.7 liter *Detroit Diesel* engine.[82]  The research paper from which he drew the acceleration data indicated that the test tractor was equipped with a *Cummings* N14 ESPI 310/390 engine.[83]  Dr. Parker stated that he *felt* these engines were similar (even though produced by different manufacturers), but he utterly failed to explain *why* he made

---

[79] Doc. no. 53, at 13-14.  *See also* Parker Depo., at 169, lines 19-23; *id*. at 193, lines 16-21; *id*. at 194, lines 4-14.

[80] *See*, *e.g.*, Parker Depo., at 110, line 6 - 112, line 1; *id*. at 103, line 22 - 104, line 5; *id*. at 105, lines 16-21.

[81] ***Nota bene:***  as the court understands it, a change in acceleration would affect both the "what if" simulations Dr. Parker prepared as well as the actual "accident reconstruction" video. Dr. Parker used acceleration data to determine the impact speed of Cryer's pick-up even in the reconstruction scenario.  Therefore, the court's discussion of problems with Dr. Parker's acceleration analysis applies equally to his testimony regarding accident reconstruction and "what if" simulations.

[82] Parker Depo., at 102, lines 2-5.

[83] *Id*. at 199, lines 5-10.

27

such an assumption.[84]  *See* Advisory Committee Note to Fed. R. Evid. 702 (2000 Amends.) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").  Dr. Parker's unsubstantiated supposition is even more suspect when one considers that — just moments after conceding that he was *unaware* of the horsepower rating on Kirby's tractor — Parker testified that the test vehicle and Kirby's tractor had "a similar engine [and] horsepower rating."[85]

Dr. Parker also contends that the actual weight of Kirby's rig (tractor plus the trailer) was not material, due to the manner in which he utilized acceleration data.[86]  Again, however, Dr. Parker offered absolutely no explanation for how his use of the data would somehow render considerations of total vehicle weight — which he earlier had stated were important — irrelevant.

The weight differential is equally problematic with respect to Cryer's four-wheel-drive pick-up truck.  If, as Dr. Parker admitted, the weight of Cryer's vehicle would affect its acceleration capacity, how can he be so confident that his acceleration profile — based, as it is, on a significantly lighter, two-wheel-drive

---

[84] *Id*. at 108, lines 3-7.

[85] *Id*. at lines 5-6.  *See also id*. at 105, line 22 - 106, line 2.  At another point in during his deposition, Dr. Parker agreed with Cryer's attorney that he "*assume*[*d*]" the vehicles were similar, but did not actually have any of the hard data for the tractor-trailer Kirby was driving.  *Id*. at 201, line 18 - 202, line 5 (emphasis supplied).

[86] *See id*. at 109, lines 17-23; *id*. at 201, lines 18-21.

version of the same truck — is "a very good approximation" of the acceleration capabilities of Cryer's truck?[87]  The answer is that Dr. Parker cannot be confident of such a conclusion because he did not consider facts or data that are sufficiently comparable to the facts of this case.  Stated differently, the facts or data that Dr. Parker did consider are irrelevant to the present case.

It is true that, in many cases, "the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility," *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988), but that generalization holds true only "[s]o long as the expert's testimony rests upon 'good grounds.'"  *Quiet Technology*, 326 F.3d at 1345 (internal quotations and citation omitted).  There has been no showing that the vehicle data utilized by Dr. Parker to reach his opinions is sufficiently comparable to those vehicles actually involved in the collision forming the basis of this suit to assure the court that his testimony is reliable.  *Cf. Hafstienn v. BMW of North America, LLC*, 194 Fed. Appx. 209, 213 (5th Cir. 2006) ("In sum, Appellants used a different and dissimilar vehicle.  The vehicles unquestionably differed in length and weight, and perhaps in other respects, such as rigidity and plasticity.  And, the test vehicle was stationary even though Appellants' BMW at the time of the accident was not.  Because of these material differences between the accident and the

---

[87] *Id*. at 193, lines 4-5.

crash test, we cannot say that the district court's decision to exclude the test was an abuse of discretion.").

### b.     Braking variables and coefficient of friction data

The court also has grave concerns about Dr. Parker's failure to examine the braking system on Cryer's pick-up.[88]  In a related vein, Cryer reminds the court that Dr. Parker also did not perform an up-close inspection of the tires on the pick-up in an effort to gauge the actual coefficient of friction between the tires and the roadway surface; instead, Dr. Parker utilized the default coefficient of friction generated by his computer program:  0.6 g.[89]  This, too, is a significant failure.

Dr. Parker agreed that the condition of the brakes and braking system on Cryer's pick-up could affect stopping distance.[90]  Nevertheless, he made no efforts to inspect the brakes, brake lines, or brake fluid level of Cryer's pick-up.[91]  These failures render Dr. Parker's testimony as to the probable stopping distance of Cryer's pick-up too conjectural to be presented to a jury.

Similarly, Dr. Parker conceded that he performed nothing more than a

---

[88] Doc. no. 53, at 12-13.  *See also* Parker Depo., at 97, line 17 - 99, line 6; *id.* at 235, lines 13-18.

[89] Doc. no. 53, at 13.  *See also* Parker Depo., at 95, line 22 -  97, line 2; *id.* at 174, line 14 - 175, line 14.

[90] Parker Depo., at 98, lines 3-18.

[91] *Id.* at 97, lines 17-20.

perfunctory examination of the tires on Cryer's pick-up.[92]  Rather than testifying that

tread depth was a total non-factor when it comes to calculating the coefficient of

friction, he offered two alternative excuses for truncating his investigation:  *i.e.*, there

were wasps flying around the truck when he visually inspected it; and/or he might

have forgotten to bring along his tread-depth measuring tool.[93]   Accordingly, he

eyeballed the tires from afar, and estimated "adequate" tread depth.[94]   This sin

actually might be forgivable:  Dr. Parker testified that the coefficient of friction is not

likely to change significantly, so long as the tires are not "essentially bald,"

something he ruled out here.[95]  Another failure in his tire examination is not so easily

written off, however.

It appears Dr. Parker made no effort to ascertain the brand or type of tires that

were on Cryer's pick-up.[96]  Instead, he accessed the tire database on the EDSMAC-4

program and selected the *standard* tire reported for the *two-wheel-drive* version of

Cryer's pick-up truck.[97]   Based on that information, the program defaulted to a

coefficient of friction of 0.6 g — a number that is slightly lower than Dr. Parker's

---

[92] *Id*. at 96, lines 4-23.

[93] *Id*. at lines 9-15.

[94] *Id*. at lines 4-7.

[95] *Id*. at lines 19-23.

[96] *See id*. at 175, lines 1-14.

[97] *Id*. at 163, lines 4-17.

own preliminary estimate of 0.75 g.[98]  What is disconcerting about this is Dr. Parker's

concession that 0.6 g "was a measured value for a particular tire, *which doesn't*

*necessarily match the tire that was on this vehicle*."[99]   When asked to state more

clearly what he meant by "doesn't necessarily match," Dr. Parker said that he was "99

percent sure it's *not* the same tire.  It's a *similar* equipment tire."[100]  Yet again, Dr.

Parker offered no basis for concluding that the "standard" tire data contained in his

software program's database and the tires actually on Cryer's pick-up were "similar."

It takes no expert to note that tires, especially tires on large pick-up trucks, come in

many different sizes and tread patterns, and that they also vary widely in tread depth,

from "off-road" and "mud tires" to "racing slicks."  Without even closely examining

the tires on Cryer's pick-up, it passes strange that Dr. Parker could state with

conviction that the "standard" tires referenced in his software database were

"similar."  *Cf. Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal

Rules of Evidence requires a district court to admit opinion evidence that is connected

to existing data only by the *ipse dixit* of the expert.  A court may conclude that there

is simply too great an analytical gap between the data and the opinion proffered.").

    This court has a difficult time swallowing this, and all of the other assumptions

---

[98] *Id*. at 69, lines 7-19.

[99] *Id*. at lines 3-6 (emphasis supplied).

[100] *Id*. at 175, lines 12-13 (emphasis supplied).

that went into Dr. Parker's coefficient of friction selection.  It is quite clear that he failed to consider all available data, even data that he admitted to be potentially important (*e.g.*, the condition of the braking system).  *Cf.* Wright & Gold, 29 *Federal Practice & Procedure: Evidence* § 6266 ("Included in the analysis under Rule 702(1) is whether the expert considered all the pertinent physical and eyewitness evidence. For example, assume that in an auto accident case plaintiff calls an accident reconstruction expert who testifies defendant must have been traveling over the speed limit.  The expert bases her opinion entirely upon the extent of damage to the vehicles and admits she did not measure the skid marks, consider the extent of personal injuries, or examine any other physical evidence pertinent to estimating speed.  This opinion may be challenged under Rule 702(1) on the ground it is not based on sufficient facts or data.").

In summary, the court concludes that Dr. Parker's testimony is grounded more in unsubstantiated supposition than in fact.  Indeed, Dr. Parker admitted as much.[101] If there were good indications that his assumptions were based upon the evidence, and not random computer defaults or other arbitrary variables, the court might allow Dr. Parker to testify.  *See Otis Elevator Co.*, 861 F.2d at 663 ("It is true that relevant

---

[101] *See id.* at 238, lines 11-16 (admitting that "we have more inputs that have some form of assumption involved with them than we did hard data points.").

testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation. However, absolute certainty is not required.") (internal citations omitted). But that is not the case here; and, therefore, the court must exclude his testimony.

## C.    The Helpfulness of Dr. Parker's Testimony

As mentioned earlier, the court's decision in this case does not depend solely upon the conclusion that Dr. Parker's data sources are insufficient. Given the incomparability of much of his data to the actual facts of this case, the court also believes that his testimony falls short of the final requirement for admissibility of expert testimony under Rule 702 — *i.e.*, "that it assist the trier of fact." *Frazier*, 387 F.3d at 1262. In addition to touching on matters that are "beyond the understanding of the average lay person," *id*., the "expert testimony proffered in the case [must be] sufficiently *tied to the facts of the case* that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (emphasis supplied). *See also*, *e.g.*, *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) ("The relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case.").

The court has little doubt that Dr. Parker's testimony concerns matters that are beyond the kin of the average lay juror. A more substantial issue, however, is

34

presented with respect to the "fit" of his testimony to the facts of this case.  If, at the time of the collision, Cryer were operating a two-wheel-drive pick-up with stock tires, and Kirby were driving a 1995 Freightliner FLD-120, Dr. Parker's testimony would obviously be helpful to a jury.  Clearly, though, *neither* of those vehicles were involved in this crash.  Defendants ask the court to ignore this, and allow Dr. Parker to state his opinions based on his representation that the data is comparable — that the vehicles are "similar" — but "an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions, as we have here."  *McDowell*, 392 F.3d at 1300 (citing *Joiner*, 522 U.S. at 146).  *Cf. Hafstienn*, 194 Fed. Appx. at 212 (excluding as "irrelevant" an expert's crash test of two vehicles that were "different [from] and dissimilar [to]" the ones involved in the actual accident).

## IV.  CONCLUSION AND ORDER

For all of the foregoing reasons, plaintiff's motion *in limine* is GRANTED, and defendant's motion to strike is DENIED as moot.  Dr. Parker will not be permitted to offer testimony at the trial of this action, and his expert report and video simulations of the crash shall not be introduced into evidence, or otherwise alluded to in front of the jury.

DONE and ORDERED this 28th day of December, 2007.

United States District Judge

36